AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Virginia

APR 2 7 2017

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
|  | ) Case No. 1:17sw220      1:17ec850 |
| Disclosure of Location-Based Services for AT&T | ) |
| Telephone Number (202) 899-0228 | ) |
|  | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Facilities belonging to service provider AT&T associated with cellular telephone number (202) 899-0228.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(a) and Fed. Rule of Crim. P. 41.

located in the _____ Unknown _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Disclosure of location-based electronic communications data for AT&T cellular telephone number (202) 899-0228.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute cocaine and heroin. |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jonathan C. Boller, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

Date: ___04/27/2017___

City and state:  Alexandria, Virginia

Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

APR 2 7 2017

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT AND ORDERS PURSUANT TO 18 U.S.C. §§ 2703(c)(1)(A) AND 3122(a)(1) FOR: (1) THE DISCLOSURE OF LOCATION BASED SERVICES; (2) DISCLOSURE OF STORED TELECOMMUNICATIONS RECORDS FOR TELEPHONE NUMBER **(202) 899-0228**; AND (3) INSTALLATION OF A PEN REGISTER AND TRAP AND TRACE DEVICE | **UNDER SEAL**<br><br>1:17-sw-220<br><br>1:17-ec-850 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jonathan C. Boller, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2016.  I have experience investigating narcotics and firearms trafficking offenses.

2.      This affidavit is submitted in support of an application for the disclosure of location-based electronic communications data and an order for the installation of a pen register and trap and trace device for a cellular telephone number **(202) 899-0228** (as defined in the Application and hereinafter referred to as the "SUBJECT TELEPHONE NUMBER"), pursuant to Federal Rule of Criminal Procedure 41(d)(1) and Title 18, United States Code, Sections 2703(c) and 3122(a).  The SUBJECT TELEPHONE NUMBER is serviced by AT&T and is used by RASHOURN NILES.  As set forth in greater detail below, I believe there is probable cause to

support the determination that NILES is a member of a conspiracy to distribute cocaine, heroin, and other controlled substances and that members of the conspiracy have distributed firearms, cocaine, and heroin within the Eastern District of Virginia and elsewhere. Further, I submit there is probable cause to support the determination that NILES uses the SUBJECT TELEPHONE NUMBER to conduct narcotics trafficking.

3.      This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant. In addition, I set forth the following facts showing that there are sufficient grounds to believe that the disclosure of location-based services and the installation of a pen register and trap and trace device on the SUBJECT TELEPHONE NUMBER, will be relevant and material to an ongoing criminal investigation.

4.      The facts and information contained in this affidavit are based on my personal knowledge and information obtained from federal and state law enforcement officers. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s).

## PROBABLE CAUSE

A.      Background on the Investigation

5.      In February of 2017, a cooperating source ("CI-1") reported to the Prince William County Police Department Street Crimes Unit that an individual ("Co-Conspirator 1') was a narcotics distributor. CI-1 is a member of the Imperial Gangster Blood gang. CI-1 will be referred to in the masculine gender, regardless of CI-1's true gender. CI-1 has been convicted of two felonies, including robbery and a probation violation. He was arrested in December of 2016,

2

in Prince George's County, Maryland, for possessing a stolen firearm as a convicted felon and possession of controlled substances.

6.     Based on this information and because Co-Conspirator 1 is a known member of the Imperial Gangster Blood gang, ATF opened an investigation into Co-Conspirator 1 and other gang members, including NILES.

B.     Controlled Purchase of Cocaine from Co-Conspirator 1 on March 2, 2017

7.     On March 2, 2017, at law enforcement direction, CI-1 ordered one (1) ounce of cocaine from Co-Conspirator 1. Co-Conspirator 1 agreed to sell the cocaine for $1,300. During this conversation, CI-1 and Co-Conspirator 1 agreed to meet at a pre-arranged location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found them to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

8.     Prior to the purchase, Co-Conspirator 1 informed CI-1 that he would be out of a movie in approximately ten minutes. Law enforcement observed Co-Conspirator 1 exit the theater and enter CI-1's vehicle. Law enforcement then observed Co-Conspirator 1 exit CI-1's vehicle and enter another vehicle. Co-Conspirator 1 instructed CI-1 to follow him.

9.     Law enforcement observed Co-Conspirator 1 and a co-conspirator drive away. CI-1 followed. Co-Conspirator 1 and CI-1 stopped at the overflow parking lot of Bayside Apartments, which are located on East Longview Drive, Woodbridge, Virginia. Law enforcement observed the vehicles park and then observed Co-Conspirator 1, a co-conspirator, and CI-1 enter an apartment located on East Longview Drive.

10.     CI-1 reported that several of Co-Conspirator 1's criminal associates were located in the apartment. CI-1 also observed a black firearm on a table in the living room. According to CI-1, Co-Conspirator 1 retrieved three (3) ounces of cocaine from a suitcase in the living room. CI-1 then observed Co-Conspirator 1 weigh one (1) ounce of cocaine from this larger quantity and then package it. CI-1 then provided Co-Conspirator 1 with $1,300 and Co-Conspirator 1 provided CI-1 with the cocaine. CI-1 reported that Co-Conspirator 1 then returned the two (2) ounces of cocaine to the suitcase.

11.     After the controlled purchase, CI-1 drove to a meeting location, where law enforcement debriefed CI-1. CI-1 provided law enforcement with the suspected cocaine, which field-tested positive for the presence of cocaine.

C.      Purchase of MDMA on March 11, 2017

12.     On March 8, 2017, CI-1 reported to law enforcement that there would be an Imperial Gangster Blood gang meeting on March 11, 2017. CI-1 reported Co-Conspirator 1 would be at the meeting and that he would be able to purchase cocaine from him. On March 11, 2017, the meeting took place at the Hilton Garden Inn, which is located on 2500 Neabsco Common Place, Woodbridge, Virginia.

13.     Prior to the gang meeting, CI-1 rented the hotel room for the meeting and granted ATF access to place audio/video recorders in the room. Based on my review of the recording, I believe CI-1's description of the events and conversations at the gang meeting was accurate.

14.     In addition, prior to the gang meeting, CI-1 met with law enforcement officers. ATF special agents searched CI-1 and his vehicle for contraband with negative results. Agents then provided CI-1 with ATF agent cashier funds to purchase cocaine and/or a firearm from Co-Conspirator 1 and/or other co-conspirators. An audio recorder was placed on CI-1's person.

4

15.     Law enforcement then followed CI-1 to the hotel.  During the trip, CI-1 had a FaceTime conversation with Co-Conspirator 1, who reported that he would meet CI-1 at the hotel.  Shortly thereafter, law enforcement observed Co-Conspirator 1 arrive at the hotel.

16.     CI-1, Co-Conspirator 1, and other gang members met within a hotel room. During the meeting, Co-Conspirator 1 called and ordered pizza.  Co-Conspirator 1 provided the number (703) 226-9912 as his phone number.

17.     Later that evening, CI-1 and Co-Conspirator 1 left the hotel in CI-1's vehicle. Law enforcement followed CI-1 from the hotel to a store on Worth Avenue.  CI-1 stated that Co-Conspirator 1 called his molly source of supply and that Co-Conspirator 1 was told to meet at that location.  While CI-1 and Co-Conspirator 1 waiting in the vehicle, an individual approached CI-1's vehicle and leaned through the open window to speak with Co-Conspirator 1.  CI-1 positively identified RASHOURN NILES from a DMV photograph, as being the individual who leaned through CI-1's window to speak with Co-Conspirator 1.  NILES made a statement to Co-Conspirator 1 to the effect of "you know what I drive," followed by a description of where his vehicle was parked within the parking lot.  CI-1 drove Co-Conspirator 1 to the specified location where Co-Conspirator 1 entered NILES's vehicle, retrieved an unknown quantity of molly, and left cash payment for the molly within the vehicle.

D.     Controlled Purchase of Cocaine from Co-Conspirator 1 on March 23, 2017

18.     On March 23, 2017, CI-1 contacted Co-Conspirator 1 via FaceTime.  At law enforcement direction, CI-1 ordered two (2) ounces of cocaine from Co-Conspirator 1.  Co-Conspirator 1 agreed to sell the cocaine for $2,600.  During this conversation, CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction.  Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and

5

found it to be free of illegal contraband.  Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase.  The controlled purchase was also audio recorded.

19.     When CI-1 arrived at the location, Co-Conspirator 1 instructed him to enter his vehicle.  Prior to CI-1's arrival, a surveillance team observed Co-Conspirator 1 meet with an adult black male in a black BMW.  This vehicle was known to law enforcement to be operated by NILES, Co-Conspirator 1's stepfather.  NILES departed the area as CI-1 arrived.  CI-1 then entered Co-Conspirator 1's vehicle and the vehicle departed the area.  While driving, Co-Conspirator 1 placed a FaceTime call to his suspected source of supply.  During the call, Co-Conspirator 1 asked when there would be more cocaine and the other individual responded that he would probably have cocaine later that night or in the morning.  While in the car, Co-Conspirator 1 discussed recent ounce-level drug deals he made to two co-conspirators.

20.     Law enforcement followed Co-Conspirator 1's vehicle to the area of Bellona Road, Woodbridge, Virginia.  Law enforcement observed Co-Conspirator 1 and CI-1 exit the vehicle and enter an apartment.  According to CI-1, once inside, Co-Conspirator 1 made a statement to the effect "I just met my stepfather right there, he just brought this shit to me just now because I had run out" (NILES is Co-Conspirator 1's stepfather).  Further, I can confirm that Co-Conspirator 1 is recorded saying this on the audio recording.

21.     Co-Conspirator 1 retrieved a bag of cocaine from underneath his clothing.  Co-Conspirator 1 informed CI-1 that he had a little over two (2) ounces of cocaine and CI-1 agreed to purchase the cocaine and provided Co-Conspirator 1 with $2,600.  Co-Conspirator 1 weighed out two (2) ounces, packaged it, and provided it to CI-1.  Co-Conspirator 1 then placed the remainder of the cocaine underneath his clothing.

6

22.     Law enforcement followed Co-Conspirator 1's vehicle to the meeting location, where Co-Conspirator 1 dropped CI-1 back at his vehicle. CI-1 drove to a meeting location where law enforcement debriefed CI-1. CI-1 provided law enforcement with the suspected cocaine, which field-tested positive for the presence of cocaine.

E.      Controlled Purchase of Cocaine from Co-Conspirator 1 on March 30, 2017

23.     In the days leading up to March 30, 2017, CI-1, at law enforcement direction, arranged to purchase a "four deuce" (4.5 ounces) of cocaine from Co-Conspirator 1. Co-Conspirator 1 agreed to sell the cocaine for $5,400. CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

24.     While inside the location where the transaction took place, CI-1 stated that Co-Conspirator 1 appeared to become confused at how much cocaine he should have left after making a series of previous sales. According to CI-1, Co-Conspirator 1 then placed a phone call to NILES. Co-Conspirator 1 began the phone call by stating, "What you say that joint was you gave me before?" Co-Conspirator 1 paused then asked, "You sure bro?" Co-Conspirator 1 then paused again, stated several words that are not immediately intelligible, and stated, "That don't add up to no god damn 6." Co-Conspirator 1 then ran through the addition of a group of numbers, and made a statement that appeared to suggest Co-Conspirator 1 did not think the amount remaining and the amount he had previously sold added up to the amount he was charged with purchasing. Co-Conspirator 1 added up numbers out loud leading to a total of "161" (161 grams is equal to 5.75 ounces). Toll records from Co-Conspirator 1's phone number

7

during this period show five phone calls between (703) 226-9912 (Co-Conspirator 1) and the SUBJECT TELEPHONE NUMBER.

      F.      <u>Controlled Purchase of Cocaine from Co-Conspirator 1 on April 6, 2017</u>

      25.     In the days leading up to April 6, 2017, CI-1, at law enforcement direction, arranged to purchase two (2) ounces of "crack" cocaine and one (1) ounce of powder cocaine from Co-Conspirator 1. Co-Conspirator 1 agreed to sell the cocaine for approximately $5,000 (the actual final cost was $4,900). CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds, as well as audio recording and transmitting device(s) to conduct the controlled purchase.

      26.     After meeting with Co-Conspirator 1, CI-1 and Co-Conspirator 1 traveled to a location in Prince William County where the transaction was to take place. While inside this location, in the presence of CI-1, an adult resident of that location, and several small children, Co-Conspirator 1 began manufacturing crack cocaine. According to CI-1, at some point during this process, Co-Conspirator 1 worried about his cooking and called NILES to seek guidance. I have reviewed the audio recordings and I can confirm that I hear background noises consistent with cooking crack cocaine, including the use of a microwave and mixing items in a glass container. I also heard Co-Conspirator 1 calling someone and speaking to a subject believed to be NILES. According to Co-Conspirator 1's toll records, several phone calls were placed during this period to the SUBJECT TELEPHONE NUMBER.

      27.     Approximately 25 minutes after CI-1 purchased the crack cocaine and left Co-Conspirator 1, Co-Conspirator 1 placed a phone call to the SUBJECT TELEPHONE NUMBER.

Approximately 14 minutes later, both Co-Conspirator 1's vehicle and a vehicle known to be used by NILES were observed parked in front of a residence within Prince William County, Virginia. The mother of Co-Conspirator-1's children resides at this residence. NILES does not reside at this residence.

      G.    <u>Controlled Purchase of Heroin with NILES's Assistance on April 26, 2017</u>

      28.    In the days leading up to April 26, 2017, CI-1, at law enforcement direction, arranged to purchase two (2) ounces of "crack" cocaine and one (1) ounce of powder cocaine from Co-Conspirator 1. Prior to the transaction taking place, Co-Conspirator 1 informed CI-1 that he was "dry" (out of cocaine). CI-1 also discussed purchasing heroin through NILES. CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds, as well as audio and video recording and transmitting device(s) to conduct the controlled purchase.

      29.    After meeting with Co-Conspirator 1, CI-1 and Co-Conspirator 1 traveled to a location in Prince William County and picked up another co-conspirator ("Co-Conspirator 2"). They then travelled to a restaurant and Co-Conspirator 2 agreed to sell heroin to CI-1 in the future. Co-Conspirator 2 stated that he was traveling to Washington, DC that evening. CI-1 and Co-Conspirator 1 then dropped Co-Conspirator 2 back at his vehicle. Co-Conspirator 2 later informed Co-Conspirator 1 that he was staying in Washington, DC that evening and would not be returning to Prince William County, Virginia.

      30.    CI-1 asked Co-Conspirator 1 to call NILES to see if NILES could facilitate CI-1's purchase of heroin. In CI-1's presence, Co-Conspirator 1 called NILES via FaceTime and asked

NILES if he (NILES) could assist in obtaining heroin. They agreed to meet at a location in Prince William County. Co-Conspirator 1 and CI-1 rented a hotel room and then waited in Co-Conspirator 1's vehicle in the parking lot. A short time later, NILES was observed driving the SUBJECT VEHICLE to the hotel. NILES then parked his vehicle next to Co-Conspirator 1's vehicle.

31.     NILES informed Co-Conspirator 1 and CI-1 that he would help them out this time, but that they would need to purchase heroin directly from another co-conspirator ("Co-Conspirator 3") in the future. Co-Conspirator 3 arrived a short time later. CI-1, Co-Conspirator 1, NILES, and Co-Conspirator 3 all exited their vehicles and entered the hotel.

32.     After introductions were made, CI-1 exchanged phone numbers with Co-Conspirator 3. CI-1 then provided Co-Conspirator 3 with $6,900 and purchased approximately 79 grams of heroin.

33.     During this transaction, while NILES was in his vehicle talking to CI-1 and Co-Conspirator 1, law enforcement placed a spoofed phone call to the SUBJECT TELEPHONE NUMBER. NILES answered the phone call confirming he was in fact using the SUBJECT TELEPHONE NUMBER.

H.     Use of Location-Based Services to Further the Investigation

34.     I believe that a court order authorizing the installation of a pen register trap and trace device, the disclosure of stored records (including historical cell site information), and the disclosure of location-based services will assist agents in determining the locations that NILES frequents and therefore assist agents in identifying locations where NILES meets to conduct his drug trafficking activity. I submit it may also assist investigators in identifying NILES's co-

10

conspirators as well as where NILES or his source of supply may store their drugs, drug-related paraphernalia, and proceeds earned from their sale of drugs.

35.     Cell-sites only disclose the location of an Antenna Tower.  Like plugging a conventional phone into a "wall-jack," the wireless telecommunications providers quickly and accurately detect which one of their "wall-jack" cell-sites is accessed by a mobile phone; and, armed with knowledge of that cell-site's physical tower location, agents can inferentially approximate the SUBJECT TELEPHONE NUMBER's location, at best to within several square miles, at the beginning and end of each call.  This approximated location can be used to corroborate the observations of surveillance agents and to anticipate future movements and locations by establishing the target's habit or pattern.  For example, if a target's first and last wireless calls of the day occur in the same cell site, then the geographic footprint of the area covered by that cell-site should correspond to the general location where the target is residing, working or sleeping.  If there are several known addresses—as identified through subscriber records derived from the pen/trap or otherwise—in that same cell-site's coverage area, then there is a good possibility that the target is residing with or visiting one of those individuals.

36.     While the information acquired by cell-site analysis (which is created and stored in the ordinary course of business each and every time the mobile phone makes or receives a call) can be coarse and non-specific, information obtained from the telecommunications providers using their "Enhanced 911" tools (such as GPS fixes, triangulation, cell-site "pings," received signal strength indicator (RSSI), and timing offset analysis) can be much more precise. More precise information allows investigators to get closer to the actual handset.  Some of these E-911 tools are not records that exist in the ordinary course of business and often are not created unless the user of the phone dials "911."  Thus, unless a provider has reason to believe a mobile

11

phone's user is in distress (typically by virtue of a 911 call), telecommunications providers will require a court order to create, record, and disclose these electronic records to law enforcement. I submit that there is probable cause to support a court order to require the creation of these records and to compel the disclosure of these records. These records, however, are rarely so precise as to establish the phone's presence in a particular house or apartment and cannot be relied upon as a sole basis for attempting warrant service at any particular location.

37.     Whether the ATF receives real-time cell-sites or requests the provider disclose E-911 location information, no government "device" is involved. Rather, cell-site records are passed contemporaneously with pen register and trap and trace data from the accessing cell site to the local Mobile Telephone Switching, which forwards the information to the Provider's central collection facility (*i.e.* their law enforcement relations/court order bureau offices). From there, the provider authorizes the data stream for release to the ATF through its CALEA-compliant network.

38.     Similarly, when the ATF requests E-911 tools in an attempt to locate the physical handset, no government "device" is used. Rather, the provider will query the phone, which must be on, to ascertain its location through a two-way data dialogue. That information is captured and stored by the provider and passed on to the Investigative Agency orally or in writing (e.g. email or fax).

39.     Once I receive an order for the type of information requested herein, it is served upon the SUBJECT TELEPHONE NUMBER's Provider. Once received, it is catalogued and assigned to an electronic surveillance representative, who, based on caseload, will "provision" the SUBJECT TELEPHONE NUMBER for delivery in the appropriate "switches," thereby instructing those switches to forward the information to the Provider's central collection point.

12

"Provisioning" can occur at any time and, except for exigent cases, is dictated solely by the Provider. Thus, the ATF cannot control whether the Order will be electronically implemented during day or night.

40. Revelation of the attempt to locate and investigate NILES through use of the SUBJECT TELEPHONE NUMBER would greatly compromise our ongoing investigation. If alerted to the existence of the ongoing investigation, NILES will likely change patterns, change phones, resort to other communications media, destroy evidence, and flee.

## CONCLUSION

41. Based on the facts and circumstances stated above, I submit that there is probable cause to believe that the above-described drug violations have occurred, are presently occurring, and will continue to occur; and that NILES has used, is using, and will continue to use the SUBJECT TELEPHONE NUMBER in furtherance of his illicit drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I further believe that the installation of a pen register trap and trace device, the disclosure of stored records (including historical cell site information), and the disclosure of location-based services will permit law enforcement to monitor NILES's involvement in illegal activities. Additionally, this order would provide investigating agents the ability to identify other co-conspirators, sources of supply, and

effectively track the movements of the holder of the SUBJECT TELEPHONE NUMBER.

Respectfully submitted,

Jonathan C. Boller
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Subscribed and sworn to before me on April 27, 2017

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Hon. Theresa Carroll Buchanan
United States Magistrate Judge

14